IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


KIRBY TATE,                      *
                                 *
       Plaintiff,                *
                                 *
v.                               *     CIVIL ACTION NO. 19-00291-KD-B
                                 *
DR. SCOTT, *et al.*,             *
                                 *
       Defendants.               *


## REPORT AND RECOMMENDATION

Plaintiff Kirby Tate, an Alabama prison inmate proceeding *pro se*, filed his complaint under 42 U.S.C. § 1983. (Doc. 1). This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72(a)(2)(R), and is now before the undersigned on Defendants' Motion for Summary Judgment. After careful review of the pleadings, and for the reasons set out below, it is ordered that Defendants' Motions for Summary Judgment (Docs. 15, 16, 23, 24) be **GRANTED** in favor of Defendants and that the claims asserted against Defendants Janet Stewart, Shawn Geohagan, Corizon, LLC, and Wexford Health Sources, Inc., be **DISMISSED** with prejudice.

# I.  Summary of Allegations.[1]

Plaintiff Tate asserts claims against Shawn Geohagan, CRNP, Janet Stewart, RN, Corizon, LLC ("Corizon"), and Wexford Health Sources, Inc. ("Wexford") for inadequate medical care (including denied access to doctors and surgeries) while within the custody of the Alabama Department of Corrections ("ADOC").[2]  According to Tate, he suffered post-surgical scarring as a result of a January 2, 2018 procedure on his right pinky toe, and this has hindered his ability to walk and put on shoes.  Tate alleges that the medical defendants acted with deliberate indifference to the scarring on his toe by failing to provide him a follow up surgery and that the medical providers (Corizon and Wexford) have a policy or custom of denying necessary medical treatment to "cut costs." He contends that said failures have caused him to now walk with a limp. (Doc. 1 at 5-6, 8).  Tate seeks $100,000 punitive damages

---

[1]    The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000) (internal quotation marks omitted).

[2]    Tate also sought to assert claims against "Nurse Scott" (Doc. 20); however, Tate was advised that the Court had attempted to identify any such individual who worked at the Holman facility during the relevant time period and that no such person was identified.  (Doc. 21).  Tate was further advised that if Nurse Scott was not identified so that service could be perfected, Nurse Scott would not be a party to this action.  (Id.). Given that Nurse Scott was never identified or served, he/she is not a party to this action. Accordingly, Nurse Scott should be terminated from the case docket.

from each Defendant in their individual capacities and $50,000 from each Defendant for compensatory damages.

Defendants have answered the suit and denied the allegations against them and assert all various defenses. (Docs. 15, 24). Defendants have also filed special reports in support of their positions and included pertinent medical records of Tate, the affidavit of Defendant Nurse Janet Stewart, and the declaration of Shawn Geohagan, a nurse practitioner. (Docs. 16, 23). Defendant Nurse Stewart affirms that she is a registered nurse and that she was previously employed by Corizon at the Holman facility until March 21, 2018, when Wexford took over the contract to provide health care related services to Alabama inmates. (Doc. 16-1). Stewart avers that she currently serves as the Director of Nursing for Wexford at the Holman facility. (Id.). Defendant Shawn Geohagan, CRNP, affirms that he is a certified registered nurse practitioner and that he was previously employed by both Corizon and Wexford at the Holman Correctional facility. (Doc. 23-1).

The medical records reflect that Tate began complaining of issues related to his right pinky toe in December 2015. (Doc. 16-1 at 12, 17). He was provided medicated corn pads for the formation of a corn on his right fifth toe. (Id.) Tate was again examined for related complaints on January 11, 2016, and on March 30, 2016, an x-ray of his toe was taken. (Id.). The x-ray revealed "deformity of the fifth proximal phalanx present. No dislocation.

Moderate degenerative changes." (Id. at 13-15). Subsequent thereto, orthopedic surgeon Dr. Corbett performed surgery on Tate's toe.[3] Tate began to complain of toe pain again in October 2017, and in response, he received pain medication and was referred to Dr. Corbett for a follow up. (Doc. 16-1 at 20).

On October 23, 2017, Tate was examined by Dr. Corbett, who recommended a PIP fusion to align Tate's toe. (Id. at 22). The request for PIP fusion (for recurrent PIP contracture with hyperkeratotic lesion) was made on November 30, 2017 and was approved by Corizon. (Id. at 23). Dr. Corbett performed the second surgery on Tate's toe on January 3, 2018. (Doc. 16-1 at 25, 31). The medical records reflect that Tate was to have the wound dressing changed on January 6, 2018 and his stitches removed two weeks later. (Id. at 32). It appears Tate received follow up care in the health care unit on January 4, 6, 9, 10, 12, 14, 19, 21, 23, 25, 26, 27, 28, 29, 30, 31, and on February 5, 6, 7, 8, and 9, 2018. He also received pain medication. (Id. at 32-37, 40).

---

[3]    From the records provided, it is not clear exactly when the surgery was performed. However, a treatment note dated December 22, 2016 suggests that the surgery was performed on or around this date. (Doc. 16-1 at 17). The treatment notes reflect orders for daily dressing changes of Tate's right pinky toe, starting December 24, 2016, until the toe is healed. (Id.). There is also a February 15, 2017 note that states that Tate's toe showed it had healed with full range-of-motion and that the doctor noted that Tate appeared to be malingering. (Id. at 18).

On January 19, 2018, Nurse Stewart examined Tate for swelling and redness to Tate's surgical site. (Id. at 32). She informed informed the doctor of the non-pitting edema. (Id.). No new orders were issued. (Id.) On January 22, 2018, Tate returned to Dr. Corbett for pin removal. (Doc. 16-1 at 41). Upon Tate's return to the facility, Dr. Manuel Pouparinas reviewed Tate's records from his visit with Dr. Corbett and noted that Tate's pins and stiches had been removed and that he was "doing well." (Id.). On January 31, 2018, Nurse Stewart again examined Tate's wound, and that that it had healed, and on February 9, 2018, another nurse examined Tate's wound and noted that it had "resolved." (Id. at 32).

On Feb. 11, 2018, Tate submitted a sick call request and reported that he had been taken off treatment by Nurses Dixon and Gray because they thought his toe was healed, but it had not. He also requested to talk to the doctor about his "shoes etc." (Id. at 44). The record notation reflects that it was determined that no sick call nurse encounter was required. (Id.).

Nearly eight months later, on or around October 31, 2018,[4] Tate requested to see the doctor and reported that "an enormous scar tissue has arisen on my right pinky toe and foot that is painful and irritating. I had surgery done by Dr. Corbett two (2)

_____

[4]    From February 21, 2018 through August 2018, Tate was examined for and received x-rays for issues unrelated to this complaint, including keloids which resulted from a stabbing and x-rays of his hip, ribs, and knee. (Doc. 16-1 at 55-56, 58).

individual times and this is the after math and Dr. Corbett said after the last surgery that if I have any problems contact him!" (*Id.* at 62-63). Upon examination, the nurse noted swelling on Tate's right pinky toe.(Id. at 62). On November 17, 2018, corn care for 90 days was prescribed for Tate's right fifth toe. (Id. at 65).

On or around November 26, 2018, Tate submitted a sick call request and reported "I've explained this problem dealing with the enormous scar tissue on my right pinky toe and foot that increased from the surgery by Dr. Corbett. And it is painful. Dr. Corbett assured me if I have any problems contact him." (Doc. 16-1 at 19). Tate was examined on November 27, 2018. The medical records reflect that Tate described his pain as "stabbing, throbbing, stinging", and that the nurse observed keloids at the previous surgical site and that his shoes were not fitting properly. The treating nurse recommended "referral to provider" and provided Tate with medication for discomfort. (Id. at 64).

On January 9, 2019, Tate was examined by a nurse for complaints due to post-surgical scar tissue. Tate demanded to see Dr. Corbett, and stated that "the surgeon told me if I have any more problems, call him and that is what you are supposed to do." (Doc. 16-1 at 74). The nursing notes reflect that the examining nurse "attempted to educate patient on process" and asked Tate if the scar tissue impeded his ability to walk, sweep or perform other

jobs.  Tate admitted he did not work but stated his shoes cut the scar tissue and make it hurt.  Tate "became loud and aggressive, wanting a black doctor, [stated] the care was 'sorry'", and, after Tate became loud with the escorting officer, the exam was ended. The nursing notes indicate that Tate ambulated without a limp. (Doc. 16-1 at 74).  An X-ray was ordered to rule out calcium deposits.  (Id. at 66, 74).

An x-ray was performed on January 10, 2019.  The findings showed soft tissue swelling about the fifth metatarsophalangeal joint and recommended "follow up as clinically indicated." (16-1 at 73).  The treatment notes reflect that Dr. Stone reviewed the x-ray results with Tate on January 10, 2019.  (Id. at 74).  Tate explained that the top of his foot (where the scar tissue is) rubs his shoes and is painful.  Upon examination, the formation of keloids and soft tissue swelling were noted.  (Id.).

On January 11, 2019, the site medical director submitted a referral for a one year follow up (consult) with Dr. Corbett. (Doc. 16-1 at 38).  The referral request noted:

> Patient complains of right foot hurts where the previous surgery fifth metatarsal right foot PIP arthroplasty 12/2017 and pin removal January 2018. Patient complains of pain with wearing tennis shoes.  Related to scar requesting to return to see surgeon Dr. Corbet.
>
> Right foot with keloid development that is edematous, tender to touch on exam.  No erythemias.  Temperature of right foot is same as left foot.  Mild soft tissue swelling at scar.  Particular soft tissue swelling at fifth MTP joint.

(Doc. 16-1 at 38). The referral noted soft tissue swelling at the 5th MTP joint and that orthopedic shoes and previous surgery had failed to alleviate Tate's complaints. (Id.).

A March 20, 2019 treatment note reflects that on March 11, 2019, Tate filed an appeal requesting consult with ortho surgeon for keloids. He was given an "alternative treatment plan" of orthopedic shoes. Tate initially refused the shoes and then requested the shoes a month later. The note also reflects that "[t]his resulted in final ATP for watchful waiting with ortho shoes" (Doc. 16-1 at 76).

Thereafter, Tate was examined multiple times due to issues unrelated to his toe, including visits to neurosurgeons, spinal MRIs in March 2019, and cervical spine surgery in September 2019. (Doc. 16-1 at 67-72, 77-86).

The Court entered an order notifying the parties that Defendants' Answer and Special Reports (Docs. 15, 16, 23, 24) were being converted into a motion for summary judgment (Docs. 32, 36), and Tate filed a response opposing summary judgment (Doc. 33). The motion for summary judgment is now ripe for consideration.

**II. Summary Judgment Standard.**

Summary Judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

see <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); <u>Garczynski v. Bradshaw</u>, 573 F.3d 1158, 1165 (2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'" (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id.</u> at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." Garczynski, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id.* In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly

contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).[5]

**III. Discussion.**

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. Amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d (1992)). To meet the objective element required to demonstrate a denial of medical care in

---

[5] "Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." 11th Cir. R. 36-2.

violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need."  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).  A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 n. 9 (2002)).  "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm."  Id.  (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need.  Farrow, 320 F.3d at 1243.  "Deliberate indifference" entails more than mere negligence.  Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. 1970

(emphasis added). In interpreting *Farmer* and *Estelle,*
this Court explained in *McElligott* that "deliberate
indifference has three components: (1) subjective
knowledge of a risk of serious harm; (2) disregard of
that risk; (3) by conduct that is more than mere
negligence." *McElligott,* 182 F.3d at 1255; *Taylor,* 221
F.3d at 1258 (stating that defendant must have
subjective awareness of an "objectively serious need"
and that his response must constitute "an objectively
insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

With the constitutional standard laid out, the court turns to
Tate's claims against the Defendants.

**A. Medical Defendants Geohagan and Stewart.**

Tate claims that the medical defendants were deliberately
indifferent to his serious medical need to obtain a follow up with
the orthopedic surgeon regarding his right pinky toe. Tate alleges
that Defendant Geohagan stated that he "could not order or
recommend for [Tate] to get follow up treatment" but that the
medicine he ordered Tate to "use should be enough" (doc. 1 at 5),
and every time he saw Defendant Stewart about getting some help
for his pain, she told him, "the scar tissue pain will go away and
the scar tissue will stop hurting" (id. at 6). Tate further
contends that Defendant Stewart advised him that if he was not
satisfied with her treatment he could "write the Board of Nursing
. . . but she could not help [Tate]." (Id.).

For purposes of this motion, the Court assumes that Tate's
post-surgical scar tissue (keloids) are considered a serious

medical need given his allegations of pain, which are supported by the medical records. Thus, to establish a constitutional claim Tate must show that Defendants acted wantonly, with deliberate indifference to his serious medical need, see Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); Wilson v. Seiter, 501 U.S. 294, 298-99, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991); Lancaster v. Monroe Cnty., 116 F.3d 1419, 1425 (11th Cir. 1997); however, Tate fails to show that the medical treatment he received was so grossly inadequate "as to amount to no care at all." McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) ("A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."); Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause.").

Defendants have put forth evidence showing that the medical staff at Holman prison regularly examined Tate regarding his toe pain and other complaints, consistently made referrals to specialists, obtained needed diagnostics scans, renewed pain medication prescriptions, and made necessary referrals for

surgical procedures. As it pertains to this suit, the record reflects that Tate first began to complain of painful scar tissue and request seeing Dr. Corbett on or around October 31, 2018. (Doc. 16-1 at 62-63). Notably, neither Defendants Stewart nor Geohagan are evidenced as having treated Tate for his toe pain during this time – that is from October 2018 to the present. However, the record does reflect that Tate received prompt and adequate treatment for each of his complaints, including examinations following each complaint, referrals to the staff physician, orders for "corn care", pain medication, x-ray, a submitted request for a consultation with Dr. Corbett, a filed appeal for the denied consultation with Dr. Corbett, and orthopedic shoes. (See Doc. 16-1 at 38, 62, 64-65, 73-74, 76). The last progress note indicates that orthopedic shoes had been prescribed for Tate with a plan of "watchful waiting." (Id. at 76).

While the record supports Tate's claim that he never received a second, follow up surgery on his pinky toe, it also establishes that Tate was provided conservative medical measures, namely orthopedic shoes, before returning to an orthopedic surgeon. Furthermore, Tate fails to allege (in his complaint or in response to this motion), and the record does not show, that he ever filed another grievance or sick call request regarding toe pain or the alleged need for surgical repair after he received the prescribed orthopedic shoes. For these reasons, the record does not support

Tate's claim that Defendants acted with deliberate indifference to his toe pain.

The mere fact that Tate disagrees with the efficacy of the treatment, simply prefers a different course of treatment, or prefers a different medical practitioner does not state a valid claim of medical mistreatment under the Eighth Amendment. See Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment). "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop, 871 F.2d at 1035; see also Trotter v. Correctional Medical Services, Inc., 2008 WL 2225696 at *9, 2008 U.S. Dist. LEXIS 109725 at *24 (S.D. Ala. May 29, 2008) ("It is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs."); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) (noting that a difference of opinion between

inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), *cert. denied*, 450 U.S. 1041, 101 S. Ct. 1759, 68 L. Ed. 2d 239 (1981).

Accordingly, Tate has failed to offer any evidence demonstrating that any Defendant (or any nurse, doctor, or medical provider) acted with deliberate indifference in providing him medical treatment while incarcerated.

**B. Medical Providers Corizon and Wexford.**

Defendants Corizon and Wexford are private entities contracted to provide medical services to ADOC prisoners. "For § 1983 liability to attach to a private corporation providing prison medical care to prisoners, it must be shown that a prisoner's constitutional rights were violated as a result of an established policy or custom of that corporation." Green v. Preemptive Forensic Health Solutions, 2015 WL 1826191 at *3, 2015 U.S. Dist. LEXIS 52715 at *8 (N.D. Ala. April 21, 2015) (citing Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997)). Tate argues Corizon and Wexford "had a policy, practice and/or custom going on that denied needing prisoners/patients from getting all of the necessary treatment needed to ensure that they healed properly. [And that he] got caught up in that illegal and unconstitutional policy." (Doc. 1 at 8). Defendants have responded to Tate's allegations and presented a record that belies these claims.

It is undisputed that Corizon contracted with the Alabama Department of Corrections to provide health care related services to Alabama state incarcerated inmates from November 1, 2007 through March 31, 2018. (Doc. 23 at 2; 16 at 2). A review of the record reveals that all sick call requests and/or grievances were responded to and Tate fails to allege facts sufficient to show that any written or verbal complaint was ignored. Further, under the contract with Corizon, Tate received two surgeries for his right pinky toe and follow up appointments. (See Soc. 16-1 at 23, 39, 41). Tate has produced no evidence showing or suggesting that Corizon denied or delayed medical treatment to him. Tate has further produced no evidence showing that he sought and was denied post-operative follow up care under Corizon's contract as medical provider. Consequently, the undersigned determines that Defendant Corizon should be granted summary judgment on all claims asserted against it and dismissed from this action.

The record reflects that Defendant Wexford denied Tate's January 11, 2019 request for a follow up/consultation with Dr. Corbett, in favor of first prescribing orthopedic shoes. (Doc. 16-1 at 38). This conservative treatment plan is supported by the record and cannot be viewed as evidence of a policy or custom to deny inmates "necessary treatment needed to ensure that they healed properly." (Doc. 1 at 8). First, Tate complained during his November 27, 2018 examination that his shoes were not fitting

properly, and on January 9, 2019 that his shoes cut the scar tissue, causing it to hurt. (Doc. 16-1 at 64, 74). Second, Tate was observed walking without a limp, and x-rays revealed soft tissue swelling (with no joint abnormalities to the joint). Thus, a plan to watch and see if orthopedic shoes would alleviate Tate's foot pain and reduce swelling appears reasonable and sound. It does not support deliberate indifference. Cf., Stewart v. Lewis, 789 F. App'x 825 (11th Cir. 2019) (Doctor's recommendation to treat Plaintiff's hammer toe first with orthopedic shoes did not support a claim for deliberate indifference, since the "conservative methods had not yet been pursued or deemed unsuccessful."). "Some delay in rendering medical treatment may be tolerable depending on the nature of the medical need and the reason for the delay." Adams v. Poag, 61 F.3d 1537, 1544 (11th Cir. 1995) (concluding when treatment is provided, a dispute between two medical doctors about the adequacy of medical treatment provided suggested medical negligence, not deliberate indifference, and cannot be grounds for § 1983 liability). Finally, the record reveals that around this same complained of time period, Wexford approved Tate's requests for visits to neurosurgeons, spinal MRIs, and cervical spine surgery (see Doc. 16-1 at 67-72, 77-86). Such evidence does not support Tate's claim that Wexford "had a policy, practice and/or custom going on that denied needing prisoners/patients from getting all of the necessary treatment needed to ensure that they

healed properly. [And that he] got caught up in that illegal and unconstitutional policy." (Doc. 1 at 8).

Given that Tate has failed to provide the court with any facts to evidence that the orthopedic shoes failed to help him, that he continues to suffer without proper medical treatment, or that his condition is worsening, and that Defendants are aware of his condition, a reasonable juror could not find that Defendants Corizon or Wexford had a policy or custom of denying inmates necessary medical treatment. For these reasons, it is recommended that summary judgment be granted in favor of Defendants Corizon and Wexford.

## IV. Conclusion.

Based on the foregoing, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED**, and that Plaintiff Tate's action against Defendants be **DISMISSED** with prejudice.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. L.R. 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **16th** day of **April, 2021.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**